IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BRIAN M. BIDEAU, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 10-2390-JTM/KGG |
| | ) |
| BEACHNER GRAIN, INC., | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Brian Bideau, asserts two theories of recovery in this lawsuit: (1) wrongful termination in violation of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101, et seq.; and (2) wrongful termination in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.  The defendant, Beachner Grain, Inc. ("Beacher"), has filed a motion for summary judgment as to both of these claims.  (Doc. #29)

For the reasons discussed below, a reasonable jury could return a verdict in favor of Mr. Bideau on each of his claims.  Accordingly, Beachner's motion for summary judgment must be denied in its entirety.

**STATEMENT OF FACTS**

Pursuant to D. Kan. Rule 56.1, Mr. Bideau will first respond to the facts set forth in Beachner's memorandum in support of summary judgment. (Doc. #30)  Mr. Bideau will then set forth additional facts which, together with Beachner's facts, raise disputed material issues which must be submitted to a jury.

## A. Facts Set Forth In Beachner's Memorandum

1.-5.   Uncontroverted.

6.   Uncontroverted but must be supplemented.  See Statement of Facts below at no. 64.

7.   Controverted in part.  Mr. Bideau testified that he reported directly to Cory Falke, and that Mr. Falke was his supervisor.  (Depo. of B. Bideau at pp. 52-54, included in the plaintiff's appendix in opposition to summary judgment [hereinafter "plt. append."]  In addition, Gary Beachner testified that in the fall of 2008, he delegated to Mr. Falke more of the counseling sessions with Mr. Bideau.  (Depo. of G. Beachner at pp. 95-96, included in plt. append.)

8.   Uncontroverted but must be supplemented.  See Statement of Facts below at no. 63.

9.   Uncontroverted.

10.   Controverted in part.  Progressive discipline is the "usual" procedure under Beachner's disciplinary policy, which states in relevant part:

> Disciplinary action may be any of the following four steps:  1) verbal warning, 2) written warning, 3) suspension with or without pay, and 4) termination of employment.  We will look at how severe the problem is and how often it has happened when deciding which step to take.  There may be circumstances when one or more steps are bypassed.
>
> <u>In very serious situations</u>, some types of employee problems may justify either an immediate suspension, or <u>in extreme situations</u>, termination of employment, <u>without going through the usual progressive discipline steps.</u>
>
> By using progressive discipline, we hope that most employee problems can be corrected at an early stage, benefiting both the employee and Beachner Grain.

(Bideau depo. exh. 8 at p. 25, included in plt. append.  Emphasis added.)

11.     Uncontroverted.

12.     Controverted.  Mr. Bideau testified that he did not have any on-site personal counseling sessions about his work performance with Mr. Beachner.  (Depo. of B. Bideau at p. 129; declar. of B. Bideau at ¶ 2; both included in plt. append.)

13.     Controverted.  Mr. Bideau testified that during the first six to eight weeks of his employment with Beachner, he did not have confrontations with almost every employee at Beachner's facility in Chanute, Kansas.  (Declar. of B. Bideau at ¶ 3, included in plt. append.)

14.     Controverted.  Mr. Bideau testified that during the first five months of his employment with Beachner, he did not have any counseling sessions with Mr. Beachner in which Mr. Beachner criticized his performance in regard to personnel issues and communication.  (Depo. of B. Bideau at p. 129; declar. of B. Bideau at ¶¶s 2, 4; both included in plt. append.)

15.     Controverted.  A reasonable jury could choose to disbelieve Mr. Beachner's testimony.  Mr. Bideau testified that during the first five months of his employment with Beachner, he did not have any counseling sessions with Mr. Beachner in which Mr. Beachner criticized his performance in regard to learning the operational issues and the flow of the business; handling interruptions or changes to operational activities; or the ability to manage.  (Depo. of B. Bideau at p. 129; declar. of B. Bideau at ¶¶s 2, 4; both included in plt. append.)

16.     Controverted.  Mr. Bideau testified that during the summer and fall of 2008, he did not have any counseling sessions with Mr. Beachner in which Mr.

Beachner criticized his work performance. (Depo. of B. Bideau at p. 129; declar. of B. Bideau at ¶¶s 2, 5; both included in plt. append.)

17. Controverted. A reasonable jury could choose to disbelieve Mr. Beachner's testimony. Mr. Bideau testified that during the summer and fall of 2008, he did not have any counseling sessions with Mr. Beachner in which Mr. Beachner criticized his work performance. (Depo. of B. Bideau at p. 129; declar. of B. Bideau at ¶¶s 2, 5; both included in plt. append.)

18. Controverted. Mr. Bideau testified that during the harvest in 2008, he did not fail to communicate with Beachner customers; nor did he avoid contact with customers; nor did he fail to appropriately manage and schedule personnel. (Declar. of B. Bideau at ¶ 6, included in plt. append.)

19. Controverted. Mr. Beachner's testimony about the reports he allegedly received from customers constitutes hearsay evidence, which is inadmissible under Fed. Rule of Evid. 801.

20. Controverted. Mr. Bideau testified that during the harvest in 2008, Mr. Beachner did not say that he had received calls from customers regarding difficulties they had in reaching Mr. Bideau, or in coordinating grain unloading schedules. (Declar. of B. Bideau at ¶ 6, included in plt. append.)

21. Controverted. A reasonable jury could choose to disbelieve Mr. Beachner's testimony. Mr. Bideau testified that in January of 2009, Mr. Beachner never told him that Mr. Beachner hoped to see more development in his skills in operating the business and in management, including management of personnel, customers, and business development. (Declar. of B. Bideau at ¶ 7, included in plt. append.)

22. Controverted in part. Mr. Bideau testified that he told both Mr. Beachner and Mr. Falke that Adam Janssen was difficult to get along with. Mr. Bideau further testified that Mr. Beachner said he would fire Mr. Janssen if he didn't straighten up. (Depo. of B. Bideau at pp. 76-80, included in plt. append.)

23. Controverted. Mr. Beachner's testimony about the statements allegedly made by Debbie Beck constitutes hearsay evidence, which is inadmissible under Fed. Rule of Evid. 801.

24. Uncontroverted.

25. Controverted. Mr. Bideau testified that during the annual grain verification of Beachner's facility in Chanute, he was able to communicate to the grain verification team what was in each grain bin, and he was not flustered. (Declar. of B. Bideau at ¶ 8, included in plt. append.)

26-28. Uncontroverted.

29.-30. Uncontroverted but must be supplemented. See Statement of Facts below at no. 76.

31. Controverted in part. A reasonable jury could find that at the time of Mr. Bideau's termination, Mr. Beachner did, in fact, have knowledge regarding the status of Mr. Bideau's health insurance; the participation of Mr. Bideau's wife in Beachner's health insurance plan; and the expenses to Beachner attributable to the claims of Mr. Bideau's wife submitted to Beachner's health insurance plan. See Statement of Facts at nos. 52, 53, 59, 67, 68.

32.-48. Uncontroverted.

49.-50. Controverted in part. Beachner's health insurance plan has a provision entitled "Organ Transplants." This provision states in relevant part:

> Benefits include care and treatment <u>due to an organ or tissue transplant</u>. Charges are payable as shown in the Schedule of Benefits under 'Other Covered Charges,' subject to the Plan's Lifetime maximum benefit.
>
> . . . .
>
> Charges related to <u>kidney transplants and dialysis treatments</u> will be subject to a $10,000 Lifetime maximum per Covered Person.

(Bideau depo. exh. 8 at p. 36, included in plt. append. Emphasis added.) Mr. Bideau believes that this provision could be interpreted to mean the $10,000 lifetime limit only applied to dialysis treatments in connection with a kidney transplant. Mr. Bideau's wife never had a kidney transplant. (Depo. of B. Bideau at pp. 101-102; declar. of B. Bideau at ¶ 9; both included in plt. append.)

51. Uncontroverted but must be supplemented. See Statement of Facts below at no. 67.

52. Controverted in part. Mr. Bideau described his conversation with Mr. Beachner as follows:

> Gary then called and said, don't do anything. <u>Let me work on it.</u> You do nothing. You let <u>me</u> work on it.

(Depo. of B. Bideau at p. 104, included in plt. append. Emphasis added.)

53. Controverted that the invoice of approximately $130,000.00 for dialysis treatments was "in excess of Beachner Grain's health plan's $10,000 lifetime limit." See Statement of Facts above at nos. 49-50.

54. Uncontroverted but must be supplemented. See Statement of Facts below at no. 70.

55. Uncontroverted but must be supplemented. See Statement of Facts below at no. 71.

56. Controverted in part. Mr. Bideau testified that after Mr. Keal received the letter of March 10, 2009, "he called and said, we can't have it worded that way, because I had said it was <u>at their request</u>, which it was." (Depo. of B. Bideau at p. 127, included in plt. append. Emphasis added.)

57.-58. Uncontroverted but must be supplemented. See Statement of Facts below at nos. 74-75.

59. Controverted. A reasonable jury could choose to disbelieve Mr. Beachner's testimony that after the meeting on September 15, 2008, he had no conversations with Mike Keal relating to Mr. or Mrs. Bideau's health insurance. Mr. Keal testified that "Gary and I probably passed and talked two or three times a week, and anything . . . that's out of the ordinary we'd talk about." (Depo. of M. Keal at pp. 32-33, included in plt. append.) Mr. Keal further testified that in April of 2009, "Gary may have called and said something about making sure that everything works out fine with . . . Brian's leaving the company. . . ." (Depo. of M. Keal at p. 106, included in plt. append.) Mr. Beachner's credibility as a witness is a disputed issue of material fact. See Statement of Facts above at nos. 12-23, 25, 31.

60.-62. Uncontroverted.

## B. Additional Facts

63. The Beachner companies, including Beachner Grain and Beachner Construction, are all owned by Gary Beachner's father and two uncles. (Depo. of G. Beachner at pp. 4, 11, included in plt. append.) Gary's father is the President of all of the Beachner companies, including Beachner Grain. (Depo. of M. Keal at p. 5, included in plt. append.)

64. As part of his duties as the General Manager and CEO of Beachner Grain, Gary Beachner reviewed on a quarterly basis the company's general ledger, which included a total of the expenses for the employee's medical costs. The higher the medical expenses were, the lower the company's net profit was. (Depo. of G. Beachner at pp. 24-25, included in plt. append.)

65. Mr. Beachner testified that he had been talking off and on to Mr. Falke about terminating Mr. Bideau's employment for about six months to one year before April of 2009. (Depo. of G. Beachner at pp. 121-122, included in plt. append.) However, Mr. Bideau testified that Mr. Falke never criticized his work performance, but rather always told him "you're doing great," or "[y]ou're doing an excellent job." (Depo. of B. Bideau at p. 68, included in plt. append.)

66. Mr. Keal reviewed all medical claims on the Beachner companies' health plan on a weekly basis. Mr. Keal became aware of the medical claims of Mr. Bideau's wife as soon as the bills were submitted, and he called Mr. Beachner to fill him in on the matter. (Depo. of M. Keal at pp. 19, 31-32, included in plt. append.)

67. On September 15, 2008, Mr. Bideau was summoned to a meeting with Mr. Beachner, Mr. Keal, and Jay Leek. During this meeting, Mr. Bideau was advised that

his wife was eligible for Medicare, and he replied that she was already on Medicare. (Depo. of B. Bideau at pp. 114-116, included in plt. append.)  Mr. Bideau was then told "since she's eligible for Medicare <u>we</u> . . . <u>want to take her off our group plan</u> 'cause she doesn't need to be on the group health plan' cause she's got Medicare."  (Depo. of B. Bideau at p. 116, included in plt. append.  Emphasis added.)  Mr. Keal testified that after the September 15 meeting, he expected Mr. Bideau to send a letter which requested his wife to be taken off the Beachner health plan.  (Depo. of M. Keal at p. 66, included in plt. append.)

68. After the meeting on September 15, 2008, Mr. Bideau received an invoice of about $130,000.00 for his wife's dialysis treatments.  Mr. Beachner told Mr. Bideau not to do anything about the invoice, but to let Mr. Beachner work on it.  See Statement of Facts at no. 52.  On October 24, 2008, BMI reached an agreement which reduced the invoice for the dialysis treatments to about $5,700.00.  See Statement of Facts at no. 53.  Sometime later in a conversation, Mr. Beachner remarked to Mr. Bideau that "BMI did a good job on negotiating that bill down."  (Depo. of B. Bideau at p. 105, included in plt. append.)

69. In 2008, the Beachner health plan paid medical claims of Mr. Bideau and his family totaling $129,510.36.  This was the highest total of all of the employees of Beachner Grain.  (Beachner depo. exhibit 27; depo. of M. Keal at pp. 26-30; both included in plt. append.)

70. On March 9, 2009, Mr. Bideau met with Mr. Keal.  See Statement of Facts at no. 54.  In his deposition, Mr. Bideau described the substance of this meeting as follows:

> As I recall, he said <u>there was a review of the claims under the health plan and my wife's claim came up</u> and we had had this meeting earlier about taking her off the health plan, so, he was told by somebody to come over there and ask me about it. He asked me about it. I think I told him at the time I would do it.

(Depo. of B. Bideau at p. 124, included in plt. append. Emphasis added.)

71. On March 10, 2009, Mr. Bideau sent a letter to Mr. Keal, stating in relevant part:

> As per our conversation yesterday, considering that my wife Roxanne is currently on disability through the Social Security administration and currently has health coverage through Medicare plus a Medicare supplement policy and a Plan D policy I will agree <u>to the request to remove her from the captioned Beachner group plan</u> effective as of today. This letter should be all that you need to remove Roxanne from the Beachner plan as of today.

(Exhibit E, included in defendant's appendix in support of summary judgment [hereinafter "def. append."], doc. #30-8 at p. 1. Emphasis added.)

72. During the week of March 16, 2009, Mr. Keal called Mr. Bideau on the telephone to talk about the March 10 letter. Mr. Keal said that the letter was not enough, since it could not indicate that there was any kind of "request" to remove Mr. Bideau's wife from Beachner's health plan. Mr. Bideau replied that his wife became very upset when she learned that he had sent the letter. Mr. Bideau further stated that his wife no longer needed dialysis, and that she would probably be kicked off Social Security Disability and Medicare in the near future. Mr. Bideau then asked Mr. Keal if that did happen, would his wife be able to get back on Beachner's health plan? Mr. Keal responded that he would investigate this question. (Exhibit E, included in def. append., doc. #30-8 at p. 1; declar. of B. Bideau at ¶ 10, included in plt. append.)

73. After this telephone conversation with Mr. Bideau, Mr. Keal discussed the matter with Mr. Leek. In turn, Mr. Leek communicated by email with BMI as to whether Mr. Bideau's wife would be able to get back on Beachner's health plan, in the event that she would lose her coverage with Medicare. (Depo. of M. Keal at pp. 90-95; Bideau depo. exhibit 16 at p. 4; both included in plt. append.)

74. On or about March 24, 2009, Mr. Keal met with Mr. Bideau, and handed him the emails from BMI which addressed whether his wife would be able to get back on Beachner's health plan. Mr. Keal then again asked Mr. Bideau to send a letter to Mr. Keal, requesting that Mrs. Bideau be removed from Beachner's health plan. (Depo. of M. Keal at pp. 95-96, included in plt. append.)

75. On the evening of March 24, 2009, Mr. Bideau sent an email to Mr. Keal, stating in relevant part:

> Thanks for bringing the copy of the email over. This will be of help. I will discuss this all with Roxanne. She is my wife, [y]es, but she is also an independent person (and often quite independent) and she is, as am I since I am responsible for her bills, very concerned in the event that she is no longer eligible for Medicare. <u>I hope that loss of Medicare coverage never arises, but I have a feeling that it will and probably in the near future</u>.

(Bideau depo. exhibit 16 at p. 3, included in plt. append. Emphasis added.)

76. On April 22, 2009, Mr. Bideau was informed in a meeting with Gary Beachner and Cory Falke that his employment was being terminated. See Statement of Facts at nos. 27-29. In his deposition, Mr. Bideau described this meeting as follows:

> He [Gary] actually said that you're not being fired. It's just not a good fit, and he said, <u>I know it's not your work</u>. If you fix something, I know it'll stay fixed, but it's just not a good fit, and I looked over at Cory who was sitting there and I said,

> what's Cory got to say about it? And Gary said, <u>Cory didn't know about this until about an hour before</u>. . . .

(Depo. of B. Bideau at p. 137, included in plt. append. Emphasis added.) Mr. Bideau further testified that nothing was said during this meeting about his management. (Depo. of B. Bideau at p. 142, included in plt. append.)

## ARGUMENTS AND AUTHORITIES

In deciding a motion for summary judgment, the court must determine whether there is a genuine issue as to any material fact, and whether the moving party is entitled to judgment as a matter of law. <u>Garrett v. Hewlett-Packard Company</u>, 305 F.3d 1210, 1216 (10th Cir. 2002). In considering whether there are any genuine issues of material fact, "the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party." <u>Gullickson v. Southwest Airlines Pilots' Ass'n</u>, 87 F.3d 1176, 1183 (10th Cir. 1996), citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). In analyzing a summary judgment motion, the court "may not make credibility determinations or weigh the evidence," and "must disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Reeves v. Sanderson Plumbing Prod. Inc.</u>, 530 U.S. 133, 150 (2000). The nonmoving party must be given "wide berth to prove a factual controversy exists." <u>Jeffries v. State of Kan.</u>, 147 F.3d 1220, 1228 (10th Cir. 1998).

As discussed in detail below, a reasonable jury, when faced with the evidence presented here, could return a verdict in favor of Mr. Bideau on both of his claims. Consequently, Beachner's motion for summary judgment must be denied in its entirety.

### I. WRONGFUL TERMINATION IN VIOLATION OF THE ADA

Mr. Bideau's first claim is that he was wrongfully terminated because of his association with a disabled person, Roxanne Bideau, in violation of the ADA. As Beachner recognizes in its brief (doc. #30 at p. 14), claims under the ADA are generally analyzed under the familiar burdenshifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 791 (1973).

#### A. Mr. Bideau's Prima Facie Case

In order to establish a prima facie case of associational discrimination under the ADA, Mr. Bideau must show: (1) he was "qualified" for the job at the time of the adverse employment action; (2) he was subjected to adverse employment action; 3) he was known by his employer at the time to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. Trujillo v. Pacificorp, 524 F.3d 1149, 1154 (10th Cir. 2008). Beachner does not contest the first three elements of Mr. Bideau's prima facie case. (Doc. #30 at p. 15)

As to the fourth element of Mr. Bideau's prima facie case, he has come forward with three pieces of circumstantial evidence from which a reasonable jury could draw an inference of disability discrimination based on association. The first piece of circumstantial evidence consists of showing that Mr. Bideau's "supervisors [had] a financial stake, however attenuated, in the firing of an 'expensive' employee." Trujillo, 524 F.3d at 1155. It is uncontroverted that Beachner Grain is a private company owned by Gary Beachner's father and two uncles. (Statement of Facts at no. 63) It is also

uncontroverted that Gary Beachner reviewed on a quarterly basis the company's general ledger, which included a total of the expenses for the employees' medical costs. (Statement of Facts at no. 64)  It is also uncontroverted that in September of 2008, Mr. Beachner was aware that the Beachner companies wanted Mrs. Bideau removed from their health plan.  (Statement of Facts at no. 67)  It is further uncontroverted that Mr. Beachner was aware that in the fall of 2008, Mr. Bideau had received an invoice of approximately $130,000.00 for his wife's dialysis treatments.  (Statement of Facts at nos. 52, 56, 69)  Finally, it is further uncontroverted that in 2008, the Beachner health plan paid medical claims of Mr. Bideau and his family totaling $129,510.36, which was the highest total of all of the employees of Beachner Grain.  (Statement of Facts at no. 69)

The second piece of circumstantial evidence from which a reasonable jury could draw an inference of disability discrimination consists of the close temporal proximity between Mr. Bideau's protected activities and the adverse action by Beachner. (Statement of Facts at nos. 54, 70-76)  The Tenth Circuit has recognized that "temporal proximity can contribute to an inference of discrimination."  Trujillo, 524 F.3d at 1157, and cases cited therein.

The third piece of circumstantial evidence from which a reasonable jury could draw an inference of discrimination consists of "disturbing procedural irregularities," including "deviations from normal company procedure."  Doebele v. Sprint/United Management Co., 342 F.3d 1117, 1138 (10th Cir. 2003), quoting Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1219-20 (10th Cir. 2002).  See also Trujillo v. Pacificorp., 524 F.3d at 1158.  This piece of evidence relates to Mr. Beachner's failure to follow the

"usual" progressive discipline procedure in terminating Mr. Bideau's employment. (Statement of Facts at nos. 10, 27-29, 76)

### B.  Beachner's Ostensible Legitimate Business Explanation

At the second stage of the burdenshifting analysis, the defendant must articulate a legitimate, nondiscriminatory reason for its decisions.  Trujillo, 524 F.3d at 1158.  Beachner has met this burden here, asserting that Mr. Bideau was terminated because "he was performing poorly in his position as Location Manager."  (Doc. #30 at p. 17)

### C.  Issues of Pretext

At the third stage of the burdenshifting analysis, the plaintiff bears the ultimate burden of demonstrating that the defendant's proffered explanation is pretextual. Trujillo, 524 F.3d at 1158.  Mr. Bideau has come forward with sufficient evidence to raise a genuine factual issue as to pretext by presenting six pieces of circumstantial evidence from which a reasonable jury could find that Beachner was actually motivated by a discriminatory animus.

Three of these pieces of circumstantial evidence were discussed above in the context of Mr. Bideau's prima facie case:  (1) firing an "expensive" employee; (2) close temporal proximity between protected activities and adverse action; and (3) disturbing procedural irregularities.  Evidence used at one stage of the burdenshifting analysis may also be used at another stage.  See Wells v. Colorado Department of Transportation, 325 F.3d 1205 (10th Cir. 2003).

The fourth piece of circumstantial evidence from which a reasonable jury could find a discriminatory motive consists of the false explanations given by Beachner for its actions.  The sufficiency of this type of circumstantial evidence to prove a wrongful

motive was upheld by the Supreme Court in <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133 (2000), explaining:

> In appropriate circumstances, <u>the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose</u>. Such an inference is consistent with the general principle of evidence law that the fact finder is entitled to consider <u>a party's dishonesty about a material fact as 'affirmative evidence of guilt.'</u> [Citations omitted]. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

530 U.S. at 147. Emphasis added. See also <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 100 (2003).

Here, a reasonable jury could find at least two of Beachner's explanations to be false. One false explanation is that Mr. Bideau performed poorly in his position as Location Manager. (Statement of Facts at nos. 13, 18, 20, 22, 25, 76) The other false explanation is that Mr. Beachner counseled Mr. Bideau about his poor work performance. (Statement of Facts at nos. 12, 14-17, 20, 21) Based on these false explanations, a reasonable jury could infer "that the employer is dissembling to cover up a discriminatory purpose." <u>Reeves</u>, 530 U.S. at 147.

The fifth piece of circumstantial evidence from which a reasonable jury could find a discriminatory motive consists of "inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions. . . ." <u>Morgan v. Hilti</u>, 108 F.3d 1319, 1323 (10th Cir. 1997). See also <u>Trujillo v. Pacificorp.</u>, 524 F.3d at 1158. Here, Mr. Beachner testified that he counseled Mr. Bideau numerous times about his poor work performance. (Statement of Facts at nos. 12, 14-17, 20, 21) However,

according to Mr. Bideau, Mr. Falke never criticized his work performance, but rather always told him "you're doing great." (Statement of Facts at no. 65) Furthermore, during the meeting on April 22, 2009, Mr. Beachner told Mr. Bideau that he was being laid off, not fired, and that it was not because of Mr. Bideau's work. (Statement of Facts at no. 76)

The sixth piece of circumstantial evidence from which a reasonable jury could find a discriminatory motive consists of "the use of subjective criteria." Garrett v. Hewlett-Packard Company, 305 F.3d 1210, 1217 (10th Cir. 2002). Although subjective criteria are not wrongful per se, "subjective decision making provides an opportunity for unlawful discrimination." Garrett, 305 F.3d at 1218. Here, Mr. Bideau was terminated for essentially subjective factors, including failing to get along with employees; failing to manage properly; failing to communicate clearly; and failing to handle interruption or changes to operational activities. (Statement of Facts at nos. 12-23, 25)

## II. WRONGFUL TERMINATION IN VIOLATION OF ERISA

Mr. Bideau's second claim is that he was wrongfully terminated for exercising his rights under ERISA. As Beachner recognizes in its brief (doc. #30 at p. 19), this claim also must be analyzed under the McDonnell Douglas framework. To survive summary judgment on his ERISA claim, Mr. Bideau must raise a genuine factual issue as to whether "[his] discharge was motivated by an intent to interfere with employee benefits protected by ERISA." Trujillo, 524 F.3d at 1160. For the reasons discussed above in regard to his ADA claim, Mr. Bideau has met this burden. As the Tenth Circuit explained in Trujillo:

> As we concluded above, the Trujillos provided sufficient evidence that the decision to terminate them was

> based on discriminatory intent to violate the ADA.  <u>That evidence also supports an inference that their discharge was motivated by an intent to interfere with their ERISA benefits.</u>

524 F.3d at 1160-1161.  Emphasis added.  A similar conclusion must be reached here.

## **CONCLUSION**

For the reasons discussed above, Beachner's motion for summary judgment must be denied in its entirety.

Respectfully Submitted by:

SLOAN, EISENBARTH, GLASSMAN,
   MCENTIRE & JARBOE, L.L.C.
1000 Bank of America Tower
534 S. Kansas Ave.
Topeka, Kansas 66603
Telephone    (785) 357-6311
Fax              (785) 357-0152

_s/Alan V. Johnson_____
Alan V. Johnson, KS #9992
ajohnson@sloanlawfirm.com

**CERTIFICATE OF SERVICE**

      I herby certify that on the 1st day of August, 2011, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following parties:

ALAN L. RUPE
ASHLEY J. SHANEYFELT
KUTAK ROCK LLP
1605 N. WATERFRONT PKWY, STE. 150
WICHITA, KS 67206
**ATTORNEYS FOR DEFENDANT**

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: NONE

        s/Alan V. Johnson
        Alan V. Johnson, KS #9992
        SLOAN, EISENBARTH, GLASSMAN,
           MCENTIRE & JARBOE, L.L.C.
        1000 Bank of America Tower
        534 S. Kansas Ave, Suite 1000
        Topeka, Kansas 66603
        Telephone   (785) 357-6311
        Fax           (785) 357-0152
        ajohnson@sloanlawfirm.com