IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BRIAN M. BIDEAU,

        Plaintiff,

        vs.                    Case No. 10-2390-JTM

BEACHNER GRAIN, INC.,

        Defendant.

MEMORANDUM AND ORDER

Plaintiff, Brian M. Bideau, brought suit against defendant, Beachner Grain, Inc., for (1) wrongful termination in violation of the Americans with Disabilities Act (ADA), and (2) wrongful termination in violation of the Employee Retirement Income Security Act (ERISA). Plaintiff claims his wife's disability was the reason for his termination and defendant claims it terminated plaintiff because of poor employment performance. This matter comes before the court on defendant's Motion for Summary Judgment (Dkt. No. 29). For the following reasons, the court denies the motion.

**I. Uncontroverted Facts**

Beachner Grain, Inc., (Beachner Grain) purchases, stores, distributes, and sells grain originating from farms near Beachner Grain facilities. It also sells minor farm supplies such as fertilizer, chemicals, seed, and livestock feed. Gary Beachner is the General Manager and CEO of Beachner Grain and is responsible for all operations and financial performance of the company. His

father and two of his uncles own Beachner Grain. Cory Falke is the Operations Manager for Beachner Grain and is responsible for day-to-day maintenance scheduling as well as being a liaison between Gary and each location manager. Mike Keal is the Human Resources Director for Beachner Construction (a separate entity from Beachner Grain). In that capacity, Keal also provides human resources support for Beachner Grain. On January 1, 2008, Beachner Grain hired plaintiff as the location manager of its Chanute, Kansas facility. As location manager, plaintiff was responsible for knowing all aspects of the operation of the facility, including the machinery, storage facilities, inventory, scale house, and bookkeeping. He had ultimate responsibility for grain management, equipment maintenance, and business development at the Chanute facility.

According to defendant, problems arose with plaintiff's employment during the first couple of months on the job. Defendant alleges plaintiff had confrontations with almost every other employee at the Chanute facility and that Gary and plaintiff had several on-site personal counseling sessions relating to personnel and communication issues. Plaintiff disputes both of those allegations. Gary testified that by April 2008, he was concerned he made a mistake hiring plaintiff because plaintiff was not learning the operation issues and flow of the business like he expected. Gary also testified that he continued to have one-on-one counseling sessions with plaintiff during the summer and fall of 2008, regarding his work performance; specifically, that plaintiff's management skills had not improved. Plaintiff denies having any counseling sessions with Gary in which Gary criticized his work performance or his management skills. During the fall harvest, in late 2008, Gary testified he received reports from customers that plaintiff was "impossible to talk to." Dkt. No. 30 Ex. A, pg. 106. According to Gary, Beachner Grain lost business because of plaintiff when potential customers hauled their grain elsewhere. Again, plaintiff disputes all these allegations. In fact,

plaintiff contends Cory Falke always told him "you're doing great," or "[y]ou're doing an excellent job." Dkt. No. 36, Ex. 2.

By January 2009, Gary testified plaintiff had not progressed in his employment. According to Gary, Adam Janssen, another employee at the Chanute facility had been requesting a transfer because of the difficulties he had with plaintiff. Because of Adam's complaints, Gary decided to have a meeting with plaintiff in January or February and told him he hoped to see more improvement in plaintiff's management skills. Plaintiff denies such a conversation ever took place but does admit he and Adam did not always get along. Gary also testified that another Chanute employee, Debbie Beck, threatened to quit because of plaintiff's behavior. Gary also stated Debbie told him plaintiff's behavior was erratic, that he would not help customers when needed, and that he could not handle the business.

In April 2009, Beachner Grain underwent its annual verification of grain inventory by the Kansas Department of Agriculture. Defendant alleges plaintiff had difficulty assisting the KDA in their verification because he did not know what grain was in each bin and became flustered. Plaintiff contends he was able to communicate what grain was in each bin and did not get flustered.

On April 22, 2009, Gary called plaintiff to a meeting with him and Cory at Beachner Grain's St. Paul, Kansas office. At the meeting, Gary told plaintiff Beachner Grain was terminating his employment because plaintiff was "not a good fit." Dkt. No. 36, Ex. 2, pg. 137. Gary further told plaintiff that Beachner Grain would provide him two weeks pay and his last day would be May 1, 2009, thus, providing him 30 days additional coverage on the company's group health plan. Following termination, plaintiff elected to participate in COBRA coverage and remained on Beachner Grain's health insurance for another 18 months. Plaintiff's employment at Beachner Grain

was at-will. Further, the company's disciplinary policy provided for progressive discipline, but also clearly stated that it did not have to use progressive discipline in all instances.

Prior to plaintiff's termination, several other facts are relevant to this matter. Mike Keal, among other things, is responsible for handling Beachner Grain's health insurance claims and enrollment. At all relevant times, Benefit Management, Inc., (BMI) was the third party administrator of Beachner Grain's health insurance plan. BMI reported all claims made on Beachner Grain's health plans to Keal on a weekly basis. Plaintiff became eligible to participate in Beachner Grain's group health insurance plan on February 1, 2008. At that time, Beachner Grain had a self-funded plan with a stop-loss policy. The stop-loss policy provided approximately $40,000 to $45,000 for individual claims in 2008-2009. Claims submitted to Beachner Grain's health insurance plan in excess of the stop-loss amount for a particular employee were paid by its stop-loss insurance carrier. In late May 2008, plaintiff's wife Roxanne was diagnosed with End Stage Renal Disease, and plaintiff notified Beachner Grain of her illness.[1] During this time she spent over a month in the hospital and Beachner Grain provided plaintiff time off to take care of her and two weeks paid leave. During July and August 2008, Roxanne incurred around $130,000 in medical bills for dialysis treatments.

Beachner Grain's health insurance plan included the following provision:

**Organ Transplants**

The Plan covers charges incurred in obtaining donor organs, including charges for the following:

1) Evaluating the organ;

---

[1] During all relevant times plaintiff was married to Roxanne Bideau. Plaintiff and Roxanne divorced on December 17, 2009.

2) Removing the organ from the donor; and
3) Transportation of the organ from within the United States and Canada to the place where the transplant is to take place.

Charges related to kidney transplants and dialysis treatments will be subject to a $10,000 Lifetime maximum per Covered Person.

Dkt. No. 36, Ex. 5. On September 15, 2008, Gary Beachner, Mike Keal, and Jay Leek (insurance controller) met with plaintiff to advise him of the $10,000 limit on dialysis treatment, to inform him his wife was eligible for Medicare, and to offer to reimburse plaintiff for Medicare Part D prescription coverage for his wife. According to plaintiff, Gary, Keal, and Leek wanted to take his wife off the company plan because she was eligible for Medicare. Plaintiff informed them his wife was covered under Medicare as of September 1, 2008.

Plaintiff received the invoices for the dialysis treatments after the September 15 meeting. He then contacted Cory Falke and told him he would contact the renal care group and discuss the bill with them. Soon after, Gary called plaintiff and told him the company would negotiate on his behalf. On October 24, 2008, BMI reached an agreement with the renal care group reducing the dialysis treatment to around $5,700. Beachner Grain paid this amount and did not ask plaintiff for reimbursement.

On March 9, 2009, Keal and plaintiff met at plaintiff's farm to discuss removing his wife from the company's health insurance plan. After a brief discussion, plaintiff agreed to remove his wife from the plan. Two days later, plaintiff sent Keal a letter stating:

As per our conversation yesterday, considering that my wife Roxanne is currently on disability through the Social Security administration and currently has health coverage through Medicare plus a Medicare supplement policy and a Plan D policy I will agree to the request to remove her from the captioned Beachner group plan effective as of today. This letter should be all that you need to remove Roxanne from the Beachner plan as of today.

5

Dkt. No. 30, Ex. E. Upon receiving the letter, Keal contacted plaintiff and asked him to remove the language about Beachner Grain "requesting" plaintiff's wife be removed. Defendant contends it wanted Roxanne's removal to be voluntary on plaintiff's part; plaintiff maintains he agreed to the removal at Beachner Grain's request. The week after plaintiff sent the letter he told Keal his wife no longer needed dialysis and that she would likely be removed from Social Security Disability and Medicare in the near future. He asked Keal if she would be able to get back on the company plan if that happened. Keal investigated the matter and told plaintiff she would be eligible for coverage under the company plan if she lost Medicare coverage. Keal also requested plaintiff provide him a letter asking that Roxanne be removed from the company policy; it appears plaintiff never sent the letter.

Gary Beachner testified that he had no involvement in plaintiff's health insurance coverage and had no conversations with Keal about plaintiff or his wife's health insurance after the September 15, 2008, meeting. Gary Beachner has no role in the health insurance provided to Beachner Grain's employees other than reviewing quarterly reports listing employees' benefits claims in the aggregate. No one mentioned plaintiff's wife or her medical condition at the April 22, termination meeting. And, Keal never told plaintiff he would be fired if he did not remove Roxanne from the plan. She was never removed from the plan prior to plaintiff's termination.

## II. Legal Standard: Summary Judgment

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact." *Id.* Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Nat. Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove [nonmovant's] claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987) (alterations added).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Id.* at 250-51. Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting FED. R. CIV. P. 56(e)) (emphasis in *Matsushita*).

Finally, the court reminds the parties that summary judgment is not a "disfavored procedural

shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). It is an important procedural vehicle "designed to secure the just, speedy and inexpensive determination of every action." *Id.* One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Id.*

### III. Conclusions of Law

*A. ADA Claim*

Plaintiff's ADA claim is predicated upon his wife's disability. Specifically, plaintiff claims his association with his wife's disability was a motivating factor in defendant's decision to fire him. Under Title I of the ADA, covered employers may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2000 & Supp. 2011). The term "discriminate against a qualified individual on the basis of disability" includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." *Id.* § 12112(b)(4). This is known as the "association provision" of the ADA. *See Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1082 (10th Cir. 1997) ("A family relationship is the paradigmatic example of a 'relationship' under the association provision of the ADA."). Thus, plaintiff's relationship with his wife is a covered "disability" under the ADA. The Tenth Circuit has recognized three categories of associational discrimination:

> [The categories] can be illustrated as follows: an employee is fired (or suffers some other adverse personnel action) because (1) ("expense") his spouse has a disability that is costly to the employer because the spouse is covered by the company's health plan; (2a) ("disability by association") the employee's homosexual companion is infected with HIV and the employer fears that the employee may also have become infected, through sexual contact with the companion; (2b) (another example of disability by association) one of the employee's blood relatives has a disabling ailment that has a genetic component and the employee is likely to develop the disability as well (maybe the relative is an identical twin); (3) ("distraction") the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours.

*Trujillo v. PacifiCorp.*, 524 F.3d 1149, 1155 (10th Cir. 2008) (quoting *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004)). Plaintiff alleges the "expense" form of associational discrimination.

The analytical framework articulated in *McDonnell Douglas Corp. v. Green*, controls the court's analysis of plaintiff's disability discrimination claim because he seeks to proceed to trial based entirely on circumstantial evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1217 (10th Cir. 2010); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-02 (1973). Under *McDonnell Douglas*, plaintiff must first establish a prima facie case of discrimination by satisfying each of these four elements:

> (1) the plaintiff was "qualified" for the job at the time of the adverse employment action;
> (2) the plaintiff was subjected to adverse employment action;
> (3) the plaintiff was known by his employer at the time to have a relative or associate with a disability;
> (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

*Trujillo*, 524 F.3d at 1154 (quoting *Den Hartog*, 129 F.3d at 1085). If plaintiff establishes a prima facie case, the burden of production "shifts to the defendant to proffer a legitimate,

9

nondiscriminatory reason for the adverse employment action." *Den Hartog*, 129 F.3d at 1085. "Once such a reason is proffered, the burden shifts back to the plaintiff to show that the employer's stated reason is pretextual." *Id.* To show pretext, plaintiff must prove "by a preponderance of the evidence that the legitimate reasons proffered by defendant were not its true reasons, but were a pretext for discrimination." *Trujillo*, 524 F.3d at 1155.

### 1. Prima Facie Case

Here, defendant does not contest the first three elements of plaintiff's prima facie case. Rather, the only issue is whether his termination occurred under circumstances raising a reasonable inference that his wife's disability was a determining factor in defendant's decision to fire him. *See Trujillo*, 524 F.3d at 1154. Plaintiff points to three pieces of circumstantial evidence supporting the fourth element. First, he points to Gary Beachner's knowledge of Roxanne's medical claims and his financial stake in firing an "expensive" employee. It is uncontroverted that Beachner Grain is a private company owned by Gary's father and two of his uncles. It is further uncontroverted that Gary reviewed the company's medical costs, which was contained in a general ledger, on a quarterly basis. Defendant contends that plaintiff's "financial stake" argument must fail because Gary never knew Roxanne's healthcare costs. However, that the quarterly reports did not contain an employee by employee breakdown of healthcare costs does not end the inquiry. Other evidence established Gary's knowledge of the health care costs. Gary knew Roxanne was in the hospital for over a month with a serious health condition sometime around May 2008. Further, Gary, Mike Keal, and Jay Leek met with plaintiff on September 15, 2008, to advise plaintiff the company's plan had a $10,000 limit on dialysis treatments and that his wife was eligible for Medicare. This circumstantial evidence

tends to show at a minimum that Gary was aware Roxanne had incurred dialysis treatment costs and that they were nearing or over $10,000. Although not conclusive, the meeting supports plaintiff's argument that Gary was aware of Roxanne's medical bills. In addition, Gary contacted plaintiff not long after the September 15, meeting to tell him the company would negotiate with the renal care provider on plaintiff's behalf, which further indicate Gary's knowledge of the dialysis costs. By October 24, defendant had reduced plaintiff's dialysis bill from over $130,000 to $5,700 and defendant paid that bill. Finally, it is uncontroverted the Bideau family's medical claims totaled $129,510.36 during 2008, the highest of any Beachner Grain employee. Although this does not mean Gary was knew the precise figure, his general knowledge of Roxanne's healthcare costs makes it likely he was aware that plaintiff's health care expenses were significant. Given the circumstantial evidence supporting Gary's knowledge, the decision to terminate plaintiff, "occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision." *See Trujillo*, 524 F.3d at 1154.

Defendant also argues plaintiff cannot make out a prima facie case because even if it knew of Roxanne's medical expenses, Beachner Grain was not at risk for higher health insurance costs as a result. Defendant contends that once its health insurance paid out the $10,000 maximum for the dialysis treatment in May 2008, it was not liable for any future costs regarding Roxanne, particularly given her Medicare eligibility on September 1, 2008. This has some validity, at least as it pertains to possible future dialysis treatment. However, she was still covered under the plan for other medical issues, including at least some kidney problems. And it is undisputed that she remained on defendant's health insurance plan after September 1. Thus, defendant's argument that after it paid the $10,000 maximum it was not liable for future costs is inaccurate. In sum, plaintiff has presented

sufficient circumstantial evidence to establish a prima facie case of associational discrimination.[2]

### 2. Legitimate Business Reason

At the second stage of the *McDonnell Douglas* burden shifting analysis, the defendant must articulate a legitimate, nondiscriminatory reason for its decisions. *See Trujillo*, 524 F.3d at 1158. Defendant has met this burden by asserting it terminated plaintiff because he was performing his job poorly, had work-related issues with coworkers, and did not communicate well with customers. Plaintiff does not dispute that defendant has met its burden.

### 3. Pretext

At the third and final stage, plaintiff bears the burden of showing the defendant's proffered reason for terminating him was pretextual. *See Trujillo*, 524 F.3d at 1158. "A plaintiff can show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006) (quoting *Green v. New Mexico*, 420 F.3d 1189, 1192-93 (10th Cir. 2005)).  "A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted

---

[2]Plaintiff also argues (1) the close temporal proximity between his wife's medical claims and the termination, and (2) defendant's failure to follow its disciplinary policy further support his prima facie case. This court will discuss these arguments in addressing whether plaintiff has established pretext.

contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (internal citations omitted). "[P]retext can be shown in a variety of ways, including but not limited to differential treatment of similarly situated employees and procedural irregularities. The former is 'especially relevant' where the defendant has proffered a legitimate non-discriminatory reason for the adverse employment action." *Trujillo*, 524 F.3d at 1158 (quoting *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1195 n.6 (10th Cir. 2000)).

Plaintiff argues he can establish pretext from circumstantial evidence in six areas: (1) close temporal proximity between Roxanne's medical claims and his termination; (2) knowledge of Roxanne's healthcare costs; (3) failure to follow disciplinary procedures; (4) false explanations given by defendant for its actions; (5) inconsistencies in defendant's stated reasons for its actions; and (6) use of subjective criteria in its termination decision.

### a. Temporal Proximity

First, plaintiff argues an inference of discrimination arises because the temporal proximity between Roxanne's medical claims and his termination. "Depending on the specific facts of the case, temporal proximity can contribute to an inference of discrimination." *Trujillo*, 524 F.3d at 1157. The closer in time between a protected action and termination, the more likely temporal proximity supports an inference of discrimination. *See id.* Here, Gary Beachner became aware of Roxanne's health issues in May 2008. Most of the costs associated with her treatment occurred from May to August 2008. Beachner Grain did not fire plaintiff until April 22, 2009, a time period of at least eight months. Even assuming Gary did not learn the amount of the medical claims until September or

October 2008, plaintiff's termination still occurred over six months later. This significant span of time cannot support a reasonable inference of discrimination. *Compare Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181-82 (10th Cir. 2006) (stating nine months was too remote to support an inference of discrimination); *Haynes v. Level 3 Comm'ns, L.L.C.*, 456 F.3d 1215, 1228 (10th Cir. 2006) (holding seven months between protected activity and alleged retaliatory conduct was not enough to support discrimination claim under Title VII, ADEA, and ADA); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (holding two to three month time period alone not enough to establish causation)*, with Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239-40 (10th Cir. 2004) (holding prima facie case established when university declined to hire plaintiff who prevailed in lawsuit against the university one month earlier); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (holding proximity of nine weeks could establish causation). Therefore, the lack of temporal proximity between the incursion of medical expenses and his termination does not support his pretext argument.

### b. Disciplinary Policy

Plaintiff's argument that Beachner Grain deviated from its discipline procedure when it fired him is equally unhelpful in establishing pretext. The company disciplinary policy provided:

> Disciplinary action may be any of the following four steps: 1) verbal warning, 2) written warning, 3) suspension with or without pay, or 4) termination of employment. We will look at how severe the problem is and how often it has happened when deciding which step to take. *There may be circumstances when one or more steps are bypassed.*

> In very serious situations, some types of employee problems may justify either an immediate suspension, or in extreme situations, termination of employment, without going through the usual progressive discipline steps.

> By using progressive discipline, we hope that most employee problems can be corrected at an early stage, benefitting both the employee and Beachner Grain.

Dkt No. 36, Ex. 5 (emphasis added). Plaintiff alleges only that defendant violated this policy, but does not explain how. The parties vigorously dispute whether plaintiff had any meetings with Gary Beachner to discuss plaintiff's alleged work problems. Whether plaintiff was verbally warned as indicated in Step 1 is unclear. It is undisputed plaintiff received no written warning and no suspension before being terminated as contemplated under Step 2 and 3. Nevertheless, accepting plaintiff's version of the facts as true defendant did not deviate from its discipline policy. The policy language clearly states "[t]here may be circumstances when one or more steps are bypassed," indicating the progressive step discipline policy is not required in all cases. This District has found that when an employer's progressive discipline policy is a permissive one, a failure to proceed through each step of the disciplinary process is not indicative of pretext. *See Peterson v. Exide Technologies*, No. 09-4122, 2011 WL 677150, at *11 (D. Kan. Feb. 16, 2011). Accordingly, defendant's decision to terminate plaintiff without going through all the steps of the disciplinary procedure was within the discretion granted to him under Beachner Grain's disciplinary policy and does not give rise to a reasonable inference of discrimination. Even if defendant had failed to follow its disciplinary procedures, the Tenth Circuit has held, "'[t]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest . . . the substantive reasons given by the employer for its employment decision were pretextual.'" *Berry v. T_Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995)).

### c. Knowledge of Healthcare Costs

As noted above, Gary Beachner's knowledge of Roxanne's medical claims establish

15

sufficient facts to make out a prima facie case of discrimination. Gary's knowledge also supports plaintiff's pretext argument. The undisputed evidence shows Gary knew Roxanne was having serious medical problems and that her medical bills for dialysis treatments exceeded $10,000. It is also clear that Gary was aware plaintiff received a $130,000 dialysis bill, which the company's health plan administrator negotiated to $5,700.[3] Finally, it is uncontroverted the Bideau family's medical claims totaled $129,510.36 during 2008, the highest of any Beachner Grain employee. As noted above, all of these facts do not conclusively show Gary knew the exact amount or extent of Roxanne's medical claims. It is, however, more likely based on these facts that Gary was aware that her health care expenses were significant. It is also true that the company sought to remove Roxanne from its health care plan beginning on September 15, 2008, and continuing into March 2009, yet she was never removed. It may be that defendant's attempt to remove Roxanne from its health insurance plan was benevolent, but that determination is inappropriate for this court to decide on summary judgment. Gary's knowledge of Roxanne's medical claims and Beachner Grain's attempt to remove her from its health care plan supports plaintiff's position that he was fired because of Roxanne's disability and not for legitimate business reasons. Therefore, Gary's knowledge of Roxanne's medical claims, together with other evidence that will be discussed below, establishes a genuine issue of material fact on the issue of pretext.

### d. False Explanation and Inconsistencies Surrounding Termination

The parties have markedly differing versions of the circumstances surrounding plaintiff's termination. Defendant contends Gary Beachner became concerned about plaintiff's ability to

---

[3]Defendant contends that because it paid plaintiff's $5,700 dialysis bill, any inference that it fired plaintiff because of Roxanne's medical bills must be eliminated. While this fact may help defendant in proving it fired defendant for a legitimate, nondiscriminatory reason, it does not foreclose plaintiff from showing that defendant's decision to fire him was pretextual.

perform his job within a couple of months after hiring him. First, Gary heard that plaintiff was not getting along well with other employees at the Chanute facility and had counseling sessions with plaintiff about those issues. Gary further testified that he had several meetings with plaintiff during the summer and fall of 2008 about plaintiff's work performance and whether he could perform his job. Gary also testified that two Chanute employees specifically requested a transfer or threatened to quit because of plaintiff. Gary also stated he received reports from customers that plaintiff was "impossible to talk to." Plaintiff disputes that Gary ever met with him about personnel issues, his work performance, or his communication with customers. In fact, plaintiff testified that Cory Falke never criticized his work and always told him "you're doing great," or "you're doing an excellent job." Dkt. No. 36, Ex. 2. Plaintiff also argues that any complaints Gary received from other employees at the Chanute facility or from any customers are inadmissible hearsay. Whether plaintiff met with Gary about his work issues is in dispute and will not be resolved upon summary judgement. The question becomes whether this dispute creates a genuine issue of material fact. The answer to this question, in part, depends on the resolution of plaintiff's hearsay objection.

Gary Beachner received complaints from two of plaintiff's coworkers at the Chanute facility—Adam Janssen and Debbie Back—and received complaints from potential customers during the fall 2008 harvest. Plaintiff does not challenge the veracity of this evidence, he contends the statements are inadmissible hearsay that this court may not consider on summary judgment. "[H]earsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat summary judgment because '[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill.'" *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). "Hearsay is a statement, other

17

than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). "Hearsay is not admissible except as provided by these rules . . . ." FED. R. EVID. 802.

Gary's testimony does not run afoul of the hearsay rules. First, Gary's testimony that he received complaints from customers that plaintiff was "impossible to talk to" is not being offered to prove plaintiff was hard to talk to. It is being offered to show the effect of the statement on the listener, that is, Gary's belief that plaintiff was impossible to talk to. Similarly, Gary's testimony about his conversations with Adam Janssen and Debbie Beck are not hearsay because they are not being offered to prove plaintiff was "difficult to work with," "left and hid during harvest," or that he "was incapable of dealing with customers." The statements are admissible for the limited purpose of providing a basis upon which Gary based his termination decision. *See, e.g.*, *Fester v. Farmer Bros. Co.*, 49 Fed. App'x 785, 789 (10th Cir. 2002) (holding opinions stated in an investigative report were not hearsay because they were being offered to establish the decision maker's state of mind in making the decision to fire plaintiff and were not being offered for the truth of the matter asserted); *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1435 (10th Cir. 1993) (holding testimony concerning plaintiff's vandalism, food damage, and poor attitude toward defendant was admissible to show defendant's state of mind in not hiring plaintiff). The relevant inquiry is whether Gary honestly believed the complaints and that he acted in good faith upon those beliefs. *See Riveria v. City & County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004).

The uncontroverted evidence of coworker and customer complaints help establish defendant's state of mind and support defendant's contention that it fired plaintiff for legitimate business reasons. Nevertheless, the parties' major disagreement regarding the alleged personnel and

job performance problems remains. Determining which party is telling the truth will be essential to the resolution of this case. If plaintiff's version is true, his likelihood of success on his claims is high. If defendant's version is true, it is likely it had legitimate non-discriminatory reasons for firing plaintiff. At the summary judgment stage it is not the court's function to resolve these disputed issues of fact or weigh the credibility of witnesses. *See Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1153 n.2 (10th Cir. 2010). The plaintiff has identified genuine issues of material fact about whether defendant's reason for terminating him is worthy of belief.

### *e. Subjective Criteria*

Last, plaintiff contends he was terminated by use of essentially subjective factors, including "failing to get along with employees; failing to manage properly; failing to communicate clearly; and failing to handle interruption or changes to operation activities." Dkt. No. 35, pg. 17. "'Courts view with skepticism the use of subjective evaluations in making termination decisions.'" *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007) (quoting *Plotke v. White*, 405 F.3d 1092, 1106 (10th Cir. 2005)).   Yet, the existence of subjective criteria alone does not establish pretext. *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 987 (10th Cir. 1996). "The appropriate inference to be drawn from the presence of subjective criteria varies with the facts of the case." *Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981).

Here, that defendants used inherently subjective criteria in making the termination decision is not in itself indicative of pretext. But, this subjective criteria becomes more significant when viewed in light of the parties' factual dispute about whether plaintiff was ever counseled about personnel issues, his management skills, or communication with customers. Therefore, the

subjective criteria used supports plaintiff's argument that his termination was pretextual.

In sum, plaintiff has presented sufficient facts showing there is a genuine issue of material fact concerning the reason for his termination. Therefore, defendant's motion for summary judgment is denied as to the ADA claim.

*B. ERISA Claim*

Section 510 of ERISA makes it unlawful "for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140 (2006). "To prevail on a § 510 interference claim, the plaintiff must show that the defendant had the specific intent to interfere with their protected ERISA rights." *Apsley v. Boeing Co.*, 722 F. Supp.2d 1218, 1232 (D. Kan. 2010) (citing *Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir. 1993)). As with the ADA claim above, plaintiff's ERISA claim is subject to the *McDonnell Douglas* burden shifting analysis. *See id.* "To make a prima facie case of interference with ERISA benefits, the [plaintiff] must establish 'by a preponderance of the evidence [] that [his] discharge was motivated by an intent to interfere with employee benefits protected by ERISA." *Trujillo*, 524 F.3d at 1160 (quoting *Phelps*, 991 F.2d at 649). "[I]f plaintiff[] show[s] a prima facie case of a violation of § 510, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for [the adverse employment decision]. If the defendant does so, the burden shifts back to the plaintiff [] to prove that the defendants proffered reason was pretextual." *Godwin v. Sw. Research*, 237 Fed.

App'x 306, 308 (10th Cir. 2007) (alterations added).

As noted above, plaintiff has provided sufficient evidence to identify a genuine issue of material fact as to whether Beachner Grain's decision to terminate him was based on a discriminatory intent in violation of the ADA. The same evidence shows a genuine issue of material fact regarding defendant's alleged interference with plaintiff's ERISA benefits. Thus, the court denies defendant's summary judgment motion as to the ERISA claim.

IT IS ACCORDINGLY ORDERED this 13th day of September 2011, that defendant's Motion for Summary Judgment (Dkt. No. 29) is denied.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE